## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**MAEGAN E. EPLIN,**

     **Plaintiff,**

**vs.**                                            **CIVIL ACTION NO. 2:21-CV-00257**

**KILOLO KIJAKAZI,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered April 21, 2021 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 10, 11)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **GRANT** Plaintiff's request for remand (ECF No. 10), **DENY** Defendant's request to affirm the decision of the Commissioner (ECF No. 11); **REVERSE** the final decision of the Commissioner; and **REMAND** this action back to the Acting Commissioner for the reasons stated *infra*.

### Procedural History

The Plaintiff, Maegan E. Eplin (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on October 20, 2015 alleging disability since July 6, 2015 because of: cardiomyopathy; bigeminy, trigeminy, quadrigeminy; a 35% ejection fraction; three unsuccessful ablations; fibromyalgia; interstitial cystitis; endometriosis; chairing malformation; trigeminal neuralgia; anxiety; depression; irritable bowel syndrome; and a tear and bulging at L4. (Tr. at 192-194, 215) Her claim was initially denied on April 14, 2016 and upon reconsideration on August 23, 2016 (Tr. at 101-105, 109-116). Thereafter, Claimant filed a written request for hearing on October 24, 2016 (Tr. at 117-118). The Honorable Francine A. Serafin, Administrative Law Judge ("ALJ"), held a hearing and subsequently issued an unfavorable decision on August 23, 2018 (Tr. at 15-34). On December 18, 2017, Claimant filed a Request for Review which was denied by the Appeals Council on October 23, 2018 (Tr. at 3-9). On August 16, 2019, Claimant filed an appeal with this Court (Tr. at 1852-1857); the Court remanded the case on March 4, 2020 (Tr. at 1860-1861). On May 4, 2020, the Appeals Council issued a Notice of Order remanding the case requiring the ALJ to "[g]ive further consideration to the claimant's trigeminal neuralgia, occipital neuralgia, irritable bowel syndrome, and interstitial cystitis, and evaluate whether they are severe, medically determinable impairments" and to "[g]ive further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations[.]" (Tr. at 1865).

Another hearing was held on September 29, 2020 before the ALJ (Tr. at 1777-1812), and on December 21, 2020, the ALJ issued an unfavorable decision (Tr. at 1746-1776, 1715-1745). On April 20, 2021, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant, (hereinafter

referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 10), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 11). Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 36 years old as of the alleged onset date and therefore considered a "younger person" throughout the relevant period at issue in this appeal. See 20 C.F.R. § 404.1563(c). (Tr. at 1873) Claimant completed the twelfth grade and then earned an Associate's degree in business. (Tr. at 1874) She has past relevant work as an accounts payable clerk, a medical secretary, and an oil and gas secretary, all sedentary jobs. (Tr. at 217, 1807)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). This Section provides as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 of this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2020. (Tr. at 1721, 1752, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, July 6, 2015. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the lumbar spine; migraines; arthralgia; thyroid disorder; diabetes; occipital neuralgia; trigeminal neuralgia; interstitial cystitis (IC); and irritable bowel syndrome (IBS)/mild chronic nonspecific gastritis, and gastroesophageal reflux disease (GERD). (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 1724, 1755, Finding No. 4) The ALJ then found Claimant had the residual functional capacity ("RFC") to perform light work:

> except this individual can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel, and crouch, but never crawl. She must avoid frequent exposure to extreme cold, wetness, and vibrations. This individual must avoid work place hazards such as moving machinery and unprotected heights. She will be off task 10% of a workday due to a need for additional breaks beyond those provided by an employer. No work environment that has a noise level above moderate as that term is used in the Selected Characteristics of Occupations.

(Tr. at 1726, 1757, Finding No. 5)

At step four, the ALJ found Claimant is capable of performing past relevant work as an accounts payable clerk, medical secretary, and oil and gas secretary. (Tr. at 1732, 1763, Finding No. 6) Finally, the ALJ determined Claimant had not been under a disability since July 6, 2015 through the date of the decision. (Tr. at 1733, 1764, Finding No. 7)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ failed to comply with the Appeals Council remand order resulting in a final decision that is unsupported by substantial evidence – Claimant contends that the ALJ failed to consider the impairments specified in the remand order, to evaluate their combined effect on her limitations, which resulted in a flawed RFC assessment. (ECF No. 10) Claimant asks this Court to reverse the decision and direct an award for benefits, given the lengthy history of this case, or alternatively, to remand to correct these errors. (Id.)

In response, the Commissioner states that the ALJ complied with the remand order, provided a thorough discussion of the medical evidence of record, and ultimately found that the combined effects related to Claimant's impairments did not limit her as alleged. (ECF No. 11) The Commissioner asserts that the RFC assessment is supported by substantial evidence and Claimant's challenge thereto is akin to asking this Court to re-weigh the evidence to obtain a different result. (Id.) The Commissioner asks this Court to affirm the ALJ's decision. (Id.)

**The Relevant Evidence of Record**[1]

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Medical Records Related to Trigeminal Neuralgia and Occipital Neuralgia:

Claimant sought specialist treatment for her face pain and headaches related to trigeminal neuralgia and occipital neuralgia. She underwent multiple MRI scans for these impairments (Tr. at 316, 1366-1367, 1377, 1384-1385), took medication, and underwent temporary nerve block injections. In October 2015, recent onset of migraine type headaches in the occipital region of the head was noted, as Claimant underwent a head MRI. (Tr. at 1377) In December 2015, Claimant's neurologist noted Claimant's history of trigeminal neuralgia, chronic occipital head pain, causing her to have migraine headaches twice per week. (Tr. at 1521) In May 2016, Claimant underwent a cervical spine MRI regarding cervical radiculopathy, chronic neck pain, headaches, and Arnold Chiari malformation; the scan revealed superimposed small central disc protrusion at C5-C6 which had developed along with borderline canal stenosis at that level. (Tr. at 1367) In September 2016, Claimant's pain specialist, Timothy Deer, M.D., recommended that she see Nicholas Bremer, M.D., to evaluate her headaches and consider the use of cervical medial branch blocks. (Tr. at 1417)

In October 2016, Dr. Bremer noted daily headaches originating in Claimant's posterior neck and radiating to the top and side of her head that were worse with stress and muscle spasm. (Tr. at 1430) He found Claimant's headaches were consistent with occipital neuralgia exacerbated by severe muscle spasm; Claimant underwent an occipital nerve block injection. (Id.)

A little over a month later, in November 2016, Claimant presented to Boone Memorial Hospital emergency department with pain in her face related to trigeminal neuralgia, among other conditions. (Tr. at 1310) Shortly thereafter, Claimant followed up with her neurologist regarding

8

face pain/trigeminal neuralgia, who noted chronic occipital headaches, as well as chronic neck pain. (Tr. at 1517)

In April 2017, Claimant underwent another occipital nerve block. (Tr. at 1451) It was noted her headaches originated mainly in the back left side of her head, and came without warning. (Tr. at 1444) Claimant followed up 20 days later, and reported 100% pain relief for approximately two days, but the pain returned and increased in severity in the left temporal/eye area afterwards; she reported pain in the left neck, facial area, jaw, and temporal/eye area, which she reported was worse with loud noises, stress, or any exertion in the facial area, such as straining her eyes during driving and weather changes; the pain was constant, and rated 7/10 in the past week. (Tr. at 1453) It was also noted that Claimant experienced 10 headaches per month, as well as sleep disturbances due to pain and urinary frequency. (Tr. at 1455)

In June 2017, Claimant was seen by her neurologist, and her pain was described as sharp, like an electric shock; chronic occipital headaches were also noted. (Tr. at 1515) At the time, Claimant underwent another occipital nerve block; although requested, an occipital radio frequency nerve ablation had been denied by insurance, however, alternative treatment options were to be discussed in the future. (Tr. at 1467)

A month later, in July 2017, it was noted that Claimant's treatments provided no relief, and a bilateral greater occipital nerve block was performed. (Tr. at 1469-1470) Again, in August 2017, it was noted that Claimant's treatments provided no relief, and she underwent another bilateral greater occipital nerve block. (Tr. at 1479-1480) During a follow up visit in September 2017, it was noted that while Claimant got 60% relief from this injection, relief only lasted two to three days. (Tr. at 1482) Left occipital radio frequency ablation was ordered. (Tr. at 1485, 1487)

However, when Claimant was seen in February 2018, she indicated the occipital radio frequency ablation had been denied. (Tr. at 1498) Instead, a sphenopalatine ganglion block was ordered to treat her trigeminal neuralgia. (Tr. at 1502)

In March 2018, Claimant underwent a cervical epidural steroid injection. (Tr. at 2616) Twice in April 2018, Dr. Bremer administered a right sphenopalatine ganglion block (Tr. at 2620, 2623) In April 2018, Claimant reported two to three migraines per week to Dr. Aimee Colegrove, her primary care doctor. (Tr. at 2229) Additionally, in April 2018, Claimant saw neurologist Alistair Hoyt, M.D., reporting pain in the left occipital area of her head, as well as pain over her right forehead, down behind her eye, and laterally back into her face; she stated that the pain in her face was a tugging, throbbing, aching pain, but became stabbing in nature with exacerbations from wind, laughing, excitement, loud music, and certain smells. (Tr. at 4736) She stated that the aching pain was more present than not, and occipital headaches occur about 60% of the day. (Id.) An occipital nerve stimulator was discussed with Claimant. (Tr. at 4739)

In May 2018, Claimant reported 50% relief from the March cervical injection, and 50% relief for a few days after each sphenopalatine ganglion block. (Tr. at 2628) She also reported to Dr. Colegrove that she was experiencing one to two migraines per week. (Tr. at 2226)

In October 2018, Claimant was seen by neurologist Kris Murthy, M.D., and reported more frequent electric shock like sharp pains lasting two to three seconds, as well as two migraines per month; it was noted her neck range of motion was decreased due to pain. (Tr. at 4640) In August 2019, Claimant told Dr. Murthy that she experienced right face sharp electrical pain periodically all day, as well as three migraines per month. (Tr. at 4642) In March 2020, she again reported right side facial pain improved, but her migraines had increased to six to eight per month. (Tr. at 4645)

It was noted that a February 2020 brain MRI revealed focal T1 and T2 heterogeneous lesions in the left petro apex. (Id.) In June 2020, Claimant reported to Dr. Murthy that the frequency of right facial pain had relatively increased, with sharp electric shock in the right V1V2 distribution, in addition to four to eight migraine headaches per month; again, her neck range of motion was noted to be decreased secondary to pain. (Tr. at 4648) Claimant returned to Dr. Murthy for low back pain in July 2020, but it was noted that she experienced right electric shock facial pain periodically lasting seconds; once again, it was noted her neck range of motion was decreased due to pain. (Tr. at 4732)

<u>Medical Records Related to Irritable Bowel Syndrome and Interstitial Cystitis:</u>

Claimant also sought specialist treatment with regard to her irritable bowel syndrome and interstitial cystitis, causing unpredictable, frequent bathroom usage, and abdominal pain. After having undergone a colonoscopy in July 2015, Claimant reported to her specialist that she had done well for three to four days following the colonoscopy, but then her symptoms, including diarrhea, abdominal pain, gas, bloating, and nausea returned. (Tr. at 984) In July 2015, Claimant underwent a cystoscopy with hydrodistension to relieve symptoms related to interstitial cystitis. (Tr. at 380) She reported abdominal pain, constant 6/10 in the lower abdomen, as well as urinary frequency and incontinence. (Id.) In February 2016, Claimant again sought treatment with her specialist, and she reported an 11-pound weight loss, as well as abdominal pain, diarrhea, nausea, and difficulty eating due to nausea and pain. (Tr. at 1000) In June 2016 at a follow-up visit with her specialist, Claimant again reported abdominal pain, nausea, diarrhea three to four times a day, and constipation alternating with diarrhea. (Tr. at 1006) In April 2017, she reported increased diarrhea and requested to have her small bowel evaluated. (Tr. at 2980) In January 2018, Claimant

reported diffuse abdominal pain for the past couple weeks, along with fatigue and a "sick feeling." She reported pain after eating, and taking Bentyl, which did not help with abdominal cramping. (Id.) It was noted that a February 2018 EGD revealed gastritis. (Tr. at 2981) In November 2018, she reported being under considerable stress due to her father's illness; she reported alternating diarrhea, cramping, and constipation.  (Tr. at 2980)

**The Administrative Hearing**

Claimant Testimony:

Regarding her trigeminal neuralgia and occipital neuralgia, Claimant testified that these impairments prevent her from sleeping and cause her migraines with pain that goes into her neck and shoulders. (Tr. at 1787) She also has blurry vision, dizziness and nothing, including ice and heat, helps with these symptoms. (Id.) She described the migraine pain as starting in the back of her head that will go over to her left ear and temple, and jaw muscle, and then into her shoulders; she has tried massage therapy to address these symptoms, which she pays out of pocket when she can. (Tr. at 1789) She also stated that medications don't help either. (Tr. at 1790) This pain also prevents her from turning her head, so she has to look out of the corner of her eye, even while driving. (Tr. at 1790-1791)

Regarding her interstitial cystitis, Claimant testified that she always feels pressure and pelvic pain, and that she wears a panty liner every day because of bladder leaks. (Tr. at 1791) Her doctors have tried many different treatments, including Botox; she still has problems with pressure and pain, and the feeling of urgency, but she is unable to urinate much, if at all. (Tr. at 1792) She described the pain as a non-stop throbbing discomfort all the time. (Tr. at 1792-1793)

Regarding irritable bowel syndrome, Claimant stated that it's "either one way or the other" – diarrhea or constipation. (Tr. at 1793) She takes MiraLAX for constipation, and has other problems associated with her IBS, including gastritis, H. pylori, and other stomach ailments. (Tr. at 1794) She experiences gas, bloating, diarrhea, spasms and pain in her left upper abdomen as well. (Id.) She has to be careful with what she eats and be near a bathroom anywhere she's at because it is either her bladder or stomach. (Tr. at 1795)

Vocational Expert (VE) Testimony:

The ALJ asked the VE to assume an initial hypothetical question regarding an individual with Claimant's age, education, and the controlling RFC, *supra*, and in response, the VE testified that the individual would be capable of performing all of Claimant's past relevant work. (Tr. at 1808) The VE also stated that the individual could be off task 10% of the workday, but not 15% or greater, in order to maintain employment, also, if the individual were to be absent two or more days a month, the individual would not be able to maintain employment. (Tr. at 1809)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

13

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

## **Analysis**

As noted *supra*, Claimant has asserted that the ALJ's decision is not supported by substantial evidence because she failed to follow the Appeals Council's remand order to adequately address Claimant's limitations from her trigeminal neuralgia, occipital neuralgia, IBS and IC.

From the onset, the ALJ recognized the task at hand in this case:

> Pursuant to the District Court remand order, Appeals Council directed the undersigned if necessary to obtain evidence from a medical expert related to the nature and severity of an functional limitations resulting from the claimants impairments; give further consideration to the claimant's trigeminal neuralgia, occipital neuralgia, irritable bowel disease, and interstitial cystitis, and determine whether they are severe or medically determinable impairments; give consideration to the claimant's maximum residual functional capacity and provide appropriate rationales; and expand the record, obtain vocational testimony regarding the claimant's ability to work.

(Tr. at 1718, 1862-1867; see also, Tr. at 1727) After having determined which impairments were severe, *supra*, which included trigeminal, occipital neuralgia, irritable bowel disease, and interstitial cystitis, among several others, including recognizing numerous non-severe, medically determinable impairments, the ALJ explicitly stated that all these impairments were considered when assessing Claimant's RFC. (Tr. at 1723) Next, at the third step, *supra*, the ALJ determined

none of these listed impairments met Listing criteria, expressly noting same for Claimant's IBS, migraines and trigeminal neuralgia, and interstitial cystitis. (Tr. at 1725)

In her discussion of the evidence, the ALJ acknowledged Claimant alleged an inability to work as result of these impairments (Tr. at 1726, 214-240), and also considered Claimant's statements in a function report from November 2015, noting that "[w]hen asked to check any item affected by her impairments or conditions, the claimant checked every box except hearing and getting along with others" and compared it to a function report from June 2016 wherein Claimant checked all boxes, including hearing and getting along with others (Tr. at 1726-1727, 249-256, 277-284).

The ALJ then noted Claimant testified about being unable to lay on either side of her face or neck due to pain and even waking up the last two mornings with migraines. (Tr. at 1727) She recognized Claimant's alleged decreased range of motion of the head because of the pain in her neck and shoulders, along with blurred vision and dizziness, and that nothing helps with this problem. (Id.) It was also noted that Claimant testified about her interstitial cystitis and fibromyalgia, and that Claimant alleged her pain "has been 'excruciating.' " and that in addition to her trigeminal neuralgia, "is 'debilitating.' " (Id.) When not attending appointments, the ALJ noted Claimant stated she napped during the day, and that she reported attending three to four appointments each day. (Id.) In addition, the ALJ noted Claimant testified that she is confined to bed three to four days a week and that her condition "is 'progressing.' " (Id.) When having a migraine, Claimant testified that she is photosensitive and unable to eat or drink; she also has pain in the back of her head that radiates to her ear and jaw, and then down the "mastoid" into her shoulders. (Id.) Although she stated she would roll around on a softball to "loosen up those

muscles", Claimant realized that was not safe due to the "carotid artery." (Id.) The ALJ noted Claimant stated she was limited to looking straight ahead or out of the corner of her eye due to severe neck pain, even difficulty using mirrors when driving. (Id.) Because of her interstitial cystitis, she reported wearing a panty liner each day due to bladder leakage, and although Claimant testified her provider discussed using Botox as a treatment option, Claimant experienced side effects from it, which caused her to hold her legs up to her chest to strain, "with veins popping in my face" to urinate. (Tr. at 1728) The ALJ further noted that Claimant testified to using Miralax for constipation from her IBS, but that she also suffers from diarrhea, and that IBS caused her stomach issues such as H-pylori, gastritis, pancreatitis, and colitis, and that Claimant's nerves and diabetes complicate these symptoms. (Id.) The ALJ acknowledged Claimant also suffers from gas, bloating, and abdominal pain in her right upper quadrant due to IBS and that over the last six months, she had more diarrhea than constipation. (Id.)

In addition to detailing other symptoms and treatment modalities related to her other impairments, the ALJ noted "while the record routinely noted the claimant served as the care provider for her parents, the claimant did not mention this when describing her daily activities." (Id.; see also Tr. at 1732) The ALJ considered Claimant's testimony from the prior administrative hearing in April 2018, when she said she stopped working in 2015 to take care of her father. (Tr. at 1729) The ALJ noted several instances from the record that Claimant reported to providers that she stopped working to take care of her father and also her mother. (Tr. at 1729, 488, 3668, 3630, 3619); (see also Tr. at 1732, 4672 ("While the claimant testified to spending her days napping or attending appointments, counseling notes showed the claimant has been walk[ing] three times a week and pushing 'herself to work late.' ")

16

The ALJ also noted that despite Claimant's allegations of debilitating conditions and impairments, "an emergency room note from June 2016 mentioned the claimant was in contact with a sick friend while working at the concession stand for the little league[.]" (Tr. at 1729, 1129, 2734, 4341) The ALJ observed, "[t]he statements raise concerns about the claimant's assertions regarding her inability to work and her functional limitations." (Tr. at 1729) The ALJ also noted that in August 2018, Claimant sought assistance from a fertility clinic, and that treatment notes indicated she had been unsuccessful in the last two years, and even recognized her diagnoses of trigeminal neuralgia, malformation, and gestational cystitis, "however, despite these impairments, she had been given the 'go ahead' to get pregnant." (Tr. at 1729, 2477-2501)

In her discussion of the evidence related to the RFC assessment, the ALJ noted that Claimant's alleged neck pain resulted in an inability to turn her head, and that she could only look forward and out of the corner of her eye. (Tr. at 1730) The ALJ acknowledged that a CT of her cervical spine showed multi-level degenerative disc disease and posterior element hypertrophy with mild central canal stenosis at C5-6 and mild neural foraminal narrowing, but no significant abnormalities (Tr. at 1730, 3749-3750).[2] The ALJ determined that "despite the cervical disc disease, objective findings suggest that the claimant retains the capacity for light exertional activities." (Tr. at 1730)

Next, the ALJ considered Claimant's trigeminal neuralgia, noting that an MRI of the brain from October 2011 documented the lesion anterior to the 7th and 8th nerve complex, and that the record showed the lesion remained unchanged since (Tr. at 1730, 315-317, 1109).[3] The ALJ

---

[2] The written decision refers to Exhibit 15F, however, this appears to be a scrivener's error, as the correct citation for these findings are from Exhibit 57F, which concerns a cervical MRI dated December 29, 2017.
[3] The ALJ referenced an MRI report dated April 24, 2014.

determined that while the lesion had not changed since 2011, it did not interfere with Claimant's

ability to work since she quit her job in July 2015 to care for her father. (Tr. at 1730, 1825-1844,

204-208) The ALJ also considered treatment records from the Cleveland Clinic from April 2014

concerning Claimant's "atypical facial pain", which noted the condition was "very hard to treat",

but that Claimant responded to oxcarbazepine. (Tr. at 1730, 2032-2033)[4] The ALJ noted Claimant

was diagnosed with trigeminal neuralgia, though no treatment recommendations were provided.

(Id.)[5] The ALJ also noted that an April 2016 treatment note from Marshall Neuroscience

referenced an MRI of the brain showing a small arachnoid cyst in front of the left cranial 7th and

8th nerve complex that was described as "stable." (Tr. at 1730, 4734-4735, 3819, 3817)[6]

Additionally, the ALJ acknowledged Claimant's testimony concerning her facial pain and

headaches, though pain management treatment notes "focused solely on the lumbar spine and

sacroiliac." (Tr. at 1730, 891-926)[7] The ALJ also considered Claimant's problems related to her

migraines, noting that treatment notes from April 2016 documented her complaints of headaches

once or twice a week associated with facial pain, however, Claimant denied nausea, vomiting,

---

[4] To the extent Claimant has contended that the ALJ improperly relied upon evidence predating her alleged onset date for these impairments (ECF No. 10 at 7-8), as discussed *infra*, the written decision demonstrates that the ALJ did consider the medical evidence during the relevant period.

[5] The ALJ observed that this Exhibit, 34F, contained only two pages, pages 34 and 88, and the remainder of the pages are not part of the record. Neither Claimant nor the Commissioner raise any concerns about the missing pages from this exhibit, save for Claimant's challenge that the ALJ "relied on Cleveland Clinic notes from April 2014", which clearly predate the alleged onset date by over a year. Ostensibly, these records have little to no evidential value in this case, given that the relevant period is from July 6, 2015 through December 31, 2020.

[6] The MRIs the ALJ referenced are dated October 21, 2011 and October 21, 2015.

[7] Although Claimant has asserted the ALJ "erroneously stated that 'while the claimant testified to debilitating facial pain and headaches, pain management notes . . . focused solely on the lumbar spine and sacroiliac (15F)" (ECF No. 10 at 8), from the undersigned's review of this exhibit, the ALJ is not wrong. While it is true that the exhibit featured treatment notes from the Center for Pain Relief from a limited period, October 2015 through June 2016, Timothy R. Deer, M.D., solely treated Claimant low back pain. (Tr. at 892-926) Nevertheless, the record also shows that Claimant continued her treatment at the Center for Pain Relief, notably with Nicholas Bremer, M.D., who continued also primarily treated her for low back pain, but also for her symptoms related to occipital neuralgia. (Tr. at 2550-2639)

blurred and double vision. (Tr. at 1730, 4734-4735) Though Claimant testified her migraines caused blurred and double vision and vomiting, and described them as "debilitating", the ALJ noted the records showed occipital headaches and migraines were "relatively stable." (Tr. at 1730, 4640-4651)[8]

Continuing her review of the medical records regarding Claimant's complaints of facial pain, the ALJ also noted that otolaryngology notes from April 2017 documented myofascial pain in the temporomandibular joint, greater on the left, causing otalgia. (Tr. at 1730, 2054-2057) The ALJ noted that the provider was able to view a 2015 brain MRI, but could not clearly identify the area on the left cranial nerve VII and VIII complex "that had been mentioned as hyperintense in the past." (Id.) However, the ALJ noted that treatment records from November 2017 indicated that Claimant's facial pain was relatively improved with Trileptal therapy. (Tr. at 1730,  1654-1665)[9] The ALJ also discussed additional treatment records: that Claimant's right frontal region was "nontender" (Tr. at 1730-1731, 1510-1522)[10]; that a progress note from October 2018 indicated the frequency of Claimant's migraines were two per month, and she reported her facial pain lasted two to three seconds (Tr. at 1731, 4640)[11]; and that a March 2020 note showed Claimant's right facial pain was relatively improved and there was a reduction in the frequency of her migraines –

---

[8] The ALJ referenced treatment records from Charleston Neurological Associates, Dr. Kris Murthy, dated October 22, 2018 through June 15, 2020.

[9] The ALJ again cites treatment records from Charleston Neurological Associates, Dr. Murthy, dated December 28, 2015 through January 21, 2018.

[10] These concern treatment records from Claimant's neurologist, Dr. Kris Murthy, dated December 28, 2015 through January 2, 2018.

[11] This concerns another treatment note from Dr. Murthy.

only six to eight in a five month period from November 2019 through March 2020. (Tr. at 1730-1731, 4640-4651)[12]

The ALJ then found that "[i]n light of the subjective statements and objective findings regarding the frequency of the claimant's migraines and two to three second duration of the facial pain related to trigeminal neuralgia", the ALJ determined Claimant would be off task 10% of the workday, and included environmental limitations as to reduce "possible triggers of trigeminal neuralgia." (Tr. at 1731) To the extent Claimant takes issue with the ALJ's RFC assessment as it fails to adequately address her monthly headaches/migraines (ECF No. 10 at 7), the undersigned is inclined to agree. With respect to the March 2020 treatment note, there is at least one finding the ALJ made that appears to be in error, but she nevertheless relied upon this erroneous finding when she made her 10% off task limitation in the RFC:

> A treatment note from March 2020 continued to show the claimant's right facial pain was relatively improved. The note indicated a reduced frequency of migraines. While earlier treatment notes mentioned one two headaches per week, the March 2020 note documented only six to eight migraines since November 2019, a five month period (70F).

(Tr. at 1731) From the undersigned's review of this particular medical record, Dr. Murthy noted: "right facial pain relatively improved" and "migraine frequency has *increased* 6 to 8 migraine headaches since the last appointment 11/19/2019" (Tr. at 4645) (emphasis added) While the record does not contain a treatment note from Dr. Murthy dated November 19, 2021, the ALJ's description that the note indicated a "reduced" frequency of migraines is inaccurate, as Dr. Murthy clearly reported Claimant's migraine frequency "increased." Looking back through Dr. Murthy's treatment records indicates that the frequency of Claimant's migraines had, in fact, not subsided

---

[12] The ALJ cites additional treatment records from Dr. Murthy.

as the ALJ found: on October 22, 2018, Dr. Murthy noted Claimant reported having "2 migraine month described since last appointment" (Tr. at 4640); on August 12, 2019, Dr. Murthy noted "3 migraine month reported" (Tr. at 4642); on June 2, 2020, Dr. Murthy noted "4 to 8 migraine headaches a month reported" (Tr. at 4648).[13] Notwithstanding that entry from March 9, 2020, Dr. Murthy's notes, when read in context, appear to indicate that Claimant had been reporting the frequency of her headaches/migraines on a monthly basis, not that she only experienced six to eight migraines from November 2019 through March 2020. Assuming *arguendo* that Claimant did only experience six to eight migraines during that five-month period, this finding still fails to address the fact that Dr. Murthy noted Claimant experienced four to eight migraine headaches a month when she returned for a follow up visit in June 2020. In short, the ALJ's finding concerning the frequency of Claimant's migraines is erroneous, which renders the 10% off task limitation in the resulting RFC also erroneous. Thus, regarding the frequency of Claimant's migraines, a severe impairment, the undersigned **FINDS** the RFC as it relates to same lacks supporting substantial evidence.[14]

    <u>Consideration of the IC and IBS Evidence:</u>

    With respect to Claimant's IC, the ALJ observed that the medical record showed that since January 2015, Claimant had mild, intermittent and unchanged urological problems, and Claimant denied using urinary "leakage" pads. (Tr. at 1731, 4211) The ALJ observed that July 2015

---

[13] Claimant returned to Dr. Murthy on June 15, 2020, following a fall the week prior at her home during which Claimant twisted her ankle, however, Dr. Murthy did not make any report concerning the frequency of Claimant's migraines (Tr. at 4650).

[14] The undersigned appreciates the Commissioner's argument that Claimant's pain as it related to trigeminal neuralgia had improved, as Dr. Murthy noted her pain level as "1" (ECF No. 11 at 8, citing Tr. at 4645). However, the record also shows that on August 12, 2019, Dr. Murthy noted Claimant's pain level as "1" but also noted her "pain rated 6 to 7 on a pain scale of 1 to 10" (Tr. at 4642), and on June 15, 2020, Dr. Murthy noted Claimant's pain level as "1" but also noted "pain rated 7 of a pain scale of 1 to 10" (Tr. at 4650).

treatment notes showed Claimant's IC was controlled with diet and improved status post cystoscopy and hydrodistention, though because of her recurrent symptoms of urinary urgency and dysuria with pelvic pain, another hydrodistention was scheduled (Tr. at 1731, 4192). By February 2016, Claimant's IC remained mild in severity and was improving; Claimant denied leakage with lifting, standing, strenuous exercise or walking (Tr. at 1731, 4157). Following another cystoscopy and hydrodistention and bladder distillation in August 2016, treatment notes from October 2016 indicated Claimant had "good results" and moderately improved symptoms (Tr. at 1731, 4112, 4123); Claimant complained of pelvic pain in October 2016, though this was due to endometriosis, and not related to urinary symptoms (Tr. at 1731, 4112). The medical record showed Claimant's urology symptoms were moderately controlled and doing well until Claimant's recent Botox treatment, although the ALJ noted that the side effects from this treatment are not expected to last a year, and Claimant's IC was well controlled with treatments and diet (Tr. at 1731, 4040-4215).

It is noted that the Appeals Council remanded this case for resolution of numerous issues, including Claimant's testimony from 2018 that she needed to take "8 to 10 unpredictable bathroom breaks over an eight-hour period" due to her IC and IBS (Tr. at 1865). During the September 2020 administrative hearing, Claimant endorsed having unpredictable use of the bathroom: "the irritable bowel's a whole another ball game. Say – I mean, it's – it's either one way or the other, like, yesterday I barely made it to the bathroom, my stomach just watch it instantly was just – I barely made it, and I've had diarrhea since then[.]" (Tr. at 1793) When asked by her attorney how many times a day she needs to go to the bathroom, Claimant responded:

> It's more so, of course, with the diarrhea – mm-hmm – and that's been – I'll have more diarrhea in the past six – six months, to where I've not had to take so much MiraLAX, and I feel like it's been a whole new symptom for me, which I've – I've told them there's been changes, you know, in that matter, because for years it was

22

constipation, which, like I said, it goes back and forth. I, you know, have to watch what I eat and then sometimes I still watch, and it still does the opposite of what I think it's going to do and tears my stomach up, but – I mean, I have to – there needs to be a bathroom anywhere I'm at, basically, because it's either the bladder or the stomach.

(Tr. at 1794-1795) From this exchange, the testimonial evidence indicates Claimant would require frequent trips to the bathroom, and at times, such trips are unpredictable, however, this evidence lends more support for her issues surrounding IBS as opposed to IC. Indeed, the ALJ recognized Claimant testified that she used panty liners everyday due to bladder leakage, but that she also had to strain to urinate when she was treated with Botox, a condition that the ALJ determined would not last a year (Tr. at 1728).

Regarding Claimant's issues with IBS, as noted *supra*, the ALJ acknowledged Claimant's testimony that she experienced a "range of stomach issues" due to her IBS, including gas, bloating, and abdominal pain, and that she had more diarrhea than constipation in the last six months. (Tr. at 1728) The ALJ also reviewed the medical evidence related to Claimant's IBS (as well as GERD), noting that a treatment record from November 2015 documented a long history of this condition, and that she had good results treating her constipation with MiraLAX. (Tr. at 1731, 3370-3371) While treatment notes showed that Claimant was under considerable stress from her father's illness, the ALJ noted that the records also showed that she reported alternating between diarrhea and constipation, which she "successfully treats" with MiraLAX and Bentyl – her symptoms related to IBS was "controlled" (Tr. at 1731, 990, 3422).[15] Medical records dated June 2020 further documented that in early 2018, Claimant underwent an EGD that showed gastritis, though her colonoscopy was normal and there was no evidence of colitis (Tr. at 1731, 4685-4686).

---

[15] The ALJ referred to treatment notes from November 2015 and June 2019.

Finally, the ALJ noted that in July 2020, Claimant reported IBS symptoms "occasionally" (Tr. at 1731, 4775).[16][17] Although Claimant has argued her symptoms related to IC and IBS are more debilitating than found by the ALJ, and has pointed to citations in the record that support this position, the ALJ also cites to the record that corroborates her findings that the impairments are not as functionally limiting as alleged, while acknowledging Claimant's testimony and allegations concerning her limitations.

However, in addition to the erroneous finding concerning Claimant's migraines/headaches, it is difficult for the undersigned to determine whether the overall RFC assessment is supported by substantial evidence, as the combined effects from all these impairments is undetermined. Although the ALJ provided adequate consideration to Claimant's impairments, specifically those identified in the remand order, it is apparent that additional consideration of Claimant's issues surrounding her migraine headaches and/or pain associated with trigeminal and occipital neuralgias need to be examined further. For instance, the record shows that Claimant experienced more frequent migraines/headaches, therefore, it stands to reason that the 10% off task limitation may be underrated, since the ALJ erroneously found Claimant experienced a reduced frequency of migraines/headaches. Given that Claimant still endorses unpredictable and frequent bathroom breaks, this too, demands further consideration by the ALJ as to whether Claimant requires additional time being off task, since the overall combined effects of Claimant's impairments must

---

[16] Incidentally, in follow up visits to Dr. Murthy for pain associated with her lower back on June 15, 2020 and July 27, 2020, Dr. Murthy's notes indicate that Claimant reported "no bowel dysfunction" (Tr. at 4650, 4732).

[17] Upon judicial review, the Commissioner's factual findings are " 'conclusive' if supported by 'substantial evidence.' " See Biestek v. Berryhill, 139 S.Ct. at 1153 (2019). Moreover, given that substantial evidence is "more than a mere scintilla" and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

be reevaluated for purposes of the RFC assessment. The undersigned recognizes that the relevant period at issue spans over five years[18], and that Claimants symptomology has changed during that time, sometimes improving, or not. However, to that extent, it appears to the undersigned that the ALJ's evaluation of Claimant's subjective complaints runs afoul of the recent Fourth Circuit decision in Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83 (4th Cir. 2020): "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Id. at 98 (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. A significant aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. As noted *supra*, in this case, the ALJ's factual finding concerning the frequency of Claimant's migraines was in error, resulting in an overinflation or misrepresentation of Claimant's abilities, particularly with respect to the RFC finding, thus, to that extent, the undersigned **FINDS** the ALJ's decision is not supported by substantial evidence.

---

[18] Claimant must show that she became disabled prior to the expiration of her insured status on December 31, 2020. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. Thus, to reiterate, to be entitled to DIB in this case, Claimant bears the burden of showing that she became disabled prior to December 31, 2020, the date when her insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after her date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370, at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is from July 6, 2015, the date of Claimant's alleged disability onset, to December 31, 2020 when her insured status expired.

As an additional matter, although the undersigned can appreciate the fact that this matter had been remanded once before, and that it has been over six years since Claimant filed her claim for benefits, the factual circumstances relied upon by the Fourth Circuit allowing for reversal and an award for benefits in Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987) are not present in the case at bar.[19] The difference here is that the issues presented in this appeal necessarily involve the reconciliation of conflicting evidence, and the weighing of evidence, which is beyond this Court's jurisdiction to remand with an award for benefits. See Johnson v. Barnhart, 434 F.3d at 653. As stated *supra*, the ALJ made a factual error concerning the frequency of Claimant's migraines, but the severity of same, the treatment she has and had received during the relevant period are variables that must be reconciled by the fact finder. Thus, despite Claimant's request for reversal and an award of benefits, remand, not reversal, is the proper remedy. I.N.S. v. Ventura, 537 U.S. 12, 16-17 (2002); Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013).

**Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Claimant's request for remand (ECF No. 10), **DENY** the Defendant's request to affirm the decision (ECF No. 11), **REVERSE** the final decision of the Commissioner, and **REMAND** this matter back to the Commissioner pursuant to the fourth sentence of 42 U.S.C §

---

[19] For instance, unfortunately, the claimant had died during the underlying proceeding, and that it had been over five years since the Court found that that the claim was "wrongfully denied." Coffman v. Bowen, 829 F.2d at 519. In this case, the undersigned found that the ALJ's unfavorable decision was not supported by substantial evidence based on a specific factual finding, however, courts cannot find such final decisions to be supported by substantial evidence piecemeal.

405(g) for further administrative proceedings in order to determine the impact of the frequency of Claimant's migraines/headaches on her RFC, in addition to what, if any, limitations Claimant has as a result of her unpredictable and frequent bathroom breaks on her RFC.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 2, 2021.



Omar J. Aboulhosn
United States Magistrate Judge